# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

UP TO $885,071 IN FUNDS ON DEPOSIT IN
UBS ACCOUNT ENDING IN 0589 HELD IN THE
NAME OF "SONAG INC."

Case Number: 17-959 M (NJ)

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Jennifer Walkowski, being duly sworn depose and say:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe that in the Eastern District of Wisconsin there is now certain property, namely, up to $885,071 in funds on deposit in UBS account ending in 0589 held in the name of "Sonag Inc.," that is civilly forfeitable under 18 U.S.C. §§ 981(a)(1)(A) and (C), including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and criminally forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) and 28 U.S.C. § 2461, as property that (1) is derived from proceeds traceable to specified unlawful activity, namely, wire fraud and wire fraud conspiracy, in violation of 18 U.S.C. §§ 1343 and 1349, and (2) was involved in concealment money laundering transactions and a concealment laundering conspiracy, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (h), and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

> ✓ Continued on the attached sheet.

> ☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Sworn to before me, and subscribed in my presence

_Signature of Affiant_
Jennifer Walkowski, SA, FBI

_October 30, 2017_
_2:30 pm_
Date and time issued

at Milwaukee, Wisconsin
City and State

Nancy Joseph, U.S. Magistrate Judge
Name & Title of Judicial Officer

_Signature of Judicial Officer_

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEIZURE WARRANTS TO SEIZE FUNDS IN UBS BANK ACCOUNTS

I, Jennifer M. Walkowski, being first duly sworn on oath, do hereby depose and say:

### Introduction

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) of the United States Department of Justice. I have been so employed with the FBI since November 2, 2003.

2. Since entering on duty with the FBI, I have investigated criminal violations including but not limited to Bank Robbery, Hobbs Act Violations, Theft of Government Property, Wire Fraud, Mail Fraud, Mortgage Fraud, Health Care Fraud, Corporate Fraud, Civil Rights Violations, Public Corruption and Money Laundering. In my capacity as an FBI Special Agent, I am charged with investigating these and other criminal violations, including the relevant violations specific to the matter described in this affidavit, more specifically described as violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), and 1956 (Money Laundering).

3. All the information contained in this affidavit is based on my personal knowledge, my review of documents and other records obtained in the course of this investigation, information I have obtained in the course of this investigation from witnesses having personal knowledge of the events and circumstances described herein, and from other law enforcement officers involved in this investigation, all of whom I believe to be truthful and reliable.

4. Because I am submitting this affidavit for the limited purpose of establishing probable cause for the requested seizure warrants, I have not included in this affidavit every detail I know about this investigation. Rather, I have included only the information I believe necessary to establish probable cause for the requested seizure warrants.

## Property Sought to be Seized

5.     I submit this affidavit in support of applications to seize up to the following amounts in the following bank accounts:

- Up to $1,349,496 from UBS account number ending in 0703, held in the name of "Sonag Company Inc. pleg'd coll acct-FBO UBS Bank USA"; and

- Up to $885,071 from UBS account number ending in 0589, held in the name of "Sonag Inc."

6.     Based on the facts set forth in detail below in this affidavit, I submit that there exists probable cause to believe that:

- Brian Ganos, the President and majority shareholder of Sonag Company, Inc., and Vice President and minority shareholder of Nuvo Construction Company, Inc. ("Nuvo"), devised and participated in a scheme to seek and obtain government set-aside contracts for which Ganos and Sonag were not eligible, and conspired with others to do so. The scheme and conspiracy involved the use of interstate wire facilities. The scheme and conspiracy also involved material misstatements of fact, and the concealment of material facts, with intent to defraud. Accordingly, the set-aside scheme and conspiracy were committed in violation of the wire fraud and wire fraud conspiracy statutes, 18 U.S.C. §§ 1343 and 1349.

- As part of this scheme and conspiracy, Ganos and co-conspirators caused Nuvo and C3T, Inc. to be formed and to be portrayed as owned and controlled by a disadvantaged individual and a service-disabled veteran, respectively. They did so in order to enable those entities to obtain set-aside contracts on the false and fraudulent pretense that Nuvo and C3T were so owned and controlled. But, in

2

fact, those entities were controlled by Ganos and co-conspirators, who were not eligible to obtain set-aside contracts. Accordingly, as Ganos and his co-conspirators knew, neither Nuvo nor C3T were eligible to receive such set-aside contracts.

- Nuvo and C3T owed their beginnings to this fraud scheme and, but for the profits they made through this fraud scheme, neither Nuvo nor C3T would likely have continued to exist following their founding.

- Specifically, according to Nuvo's general ledger, between January 2004 and December 2015, Nuvo received approximately $124.6 million in gross revenues.[1] A review of the Federal Procurement Database in April 2016 showed that Nuvo received a total of $71 million in 8(a) set-aside contracts during that period, meaning that at least 57% of Nuvo's gross revenues are known, at present, to be traceable to this fraud scheme. In addition, Nuvo earned the vast majority of its profits from 8(a) set-aside contracts.

- Likewise, C3T's general ledger reflects that, between January 2006 and April 2016, C3T received approximately $204.7 million in gross revenues. A review of the Federal Procurement Database in April 2016 showed that C3T received a total of $197 million in SDVOSB set-aside contracts during that period. Thus, at least 96% of C3T's gross revenues are known, at present, to be traceable to this fraud scheme.

---

[1] Nuvo's general ledger also reflects an additional $52 million in revenue that was passed through to Sonag Ready Mix LLC, another Ganos-controlled company. Because it appears these revenues and the associated expenses all passed through Nuvo to Sonag Ready Mix LLC entirely, they have been excluded from the totals above.

3

- In January 2011, Ganos made three transfers of $1,000,000, for a total of $3,000,000, in funds from Nuvo and C3T – which funds were traceable to proceeds and profits Ganos made through Nuvo and C3T via the set-aside fraud scheme – to a Morgan Stanley account ending in number 7004 in the name of Sonag Company (the "Morgan Stanley Sonag 7004 account").

- Specifically, in January 2011, Ganos transferred $1,000,000 from a Nuvo account at BMOHarris ending in 5207 ("Nuvo 5207"), $1,000,000 from a C3T account at BMOHarris ending in 5125 ("C3T 5125"), and $1,000,000 from a C3T BMOHarris account ending in 5866 ("C3T 5866") to the Morgan Stanley Sonag 7004 account.

- Each of those transfers constituted a concealment money laundering transaction in that Ganos made each of those three transfers using proceeds of the set-aside fraud scheme and conspiracy for the purposes of concealing the nature, source, ownership, and location of those fraud proceeds. Further, each of those transfers was made as part of a money laundering conspiracy that Ganos had entered into with co-conspirators to conceal the nature, source, ownership, and location of fraud proceeds.

- The first of these transfers – namely, the $1,000,000 transferred from Nuvo 5207 to the Morgan Stanley Sonag 7004 account in January 2011 – was funded by two earlier transfers of funds from a Nuvo BMOHarris account ending in 1990 ("Nuvo 1990"). First, in March 2010, Ganos transferred $600,000 from Nuvo 1990 to Nuvo 5207. That $600,000 is traceable to payments on federal set-aside contracts that Nuvo received in March 2010 as part of the fraud scheme. Second,

in October 2010, Ganos transferred $500,000 from Nuvo 1990 to Nuvo 5207. That $500,000 is also traceable to payments on federal set-aside contracts that Nuvo received from August 2010 to October 2010 as part of the fraud scheme.

- The second of these transfers – the $1,000,000 transferred from C3T 5215 to the Morgan Stanley Sonag 7004 account in January 2011 – was funded by an earlier transfer of funds from C3T 5866 in October 2010. That $1,000,000 is traceable to payments on federal set-aside contracts that C3T received in October 2010 as part of the fraud scheme.

- The third of these transfers – the $1,000,000 transferred from C3T 5866 to the Morgan Stanley Sonag 7004 account in January 2011 – is traceable to payments that C3T received on federal set-aside contracts in January 2011 as part of the fraud scheme.

- That each of the three $1,000,000 transfers involved funds that were profits of Nuvo and C3T is evidenced by the fact that Ganos did not have to use the transferred funds to pay Nuvo or C3T expenses but instead was able to move the funds from the Nuvo or C3T accounts to the Morgan Stanley Sonag 7004 account. It is also fair to infer that most of those profits were derived from set-aside contracts as almost all of C3T's work – and according to one long-time Nuvo project manager, 90% of Nuvo's profits – came from set-aside contracts.

- In May 2012, Ganos transferred the $3,000,000, at a reduced value, to another Morgan Stanley account held in the name of Sonag Company, ending in 5004. In July 2012, Ganos transferred $1,800,000 from that account to a Morgan Stanley account in the name of C3T, ending in 9000. In November 2012, Ganos moved

5

those funds, at a reduced value of $1,792,959.93, back to the Morgan Stanley Sonag 5004 account. Because there were no other significant deposits or withdrawals into those Morgan Stanley accounts, this affidavit refers to them collectively as the "Morgan Stanley accounts."

- In May 2013, Ganos transferred the funds from the 5004 account, at a reduced value of $2,937,857, to a UBS account ending in 0589, held in the name of Sonag, Inc. ("UBS 0589"). In January 2015, the funds were then further transferred to a UBS account ending in 0703, held in the name of "Sonag Company Inc. pleg'd coll acct-FBO UBS Bank USA" ("UBS 0703"). Brian Ganos is the authorized signer on both accounts. In May 2016, $860,000 of the funds were transferred back to UBS 0589 again. These two UBS accounts – from which the funds at issue are sought to be seized – are investment accounts, not active business operating accounts.

- Although the criminal proceeds that Ganos had originally transferred from Nuvo and C3T accounts to the Morgan Stanley Sonag account in January 2011 were eventually transferred to the UBS 0589 and UBS 0703 accounts, and a portion of those proceeds have since been expended from the UBS 0589 and UBS 0703 accounts, all the funds in those accounts as of October 24, 2017, remain traceable to proceeds from the fraud scheme and funds involved in concealment money laundering transactions undertaken as a part of the money laundering conspiracy.

- The transactions are depicted in the attached Flow of Funds Chart to aid the Court in understanding this matter.

- All these funds are therefore subject to seizure and forfeiture on two independent grounds. First, all the funds sought to be seized constitute, or are traceable to, proceeds – and very probably to profits – of the fraud scheme and are therefore subject to forfeiture and seizure as proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343 and 1349. Second, all those funds were the objects of concealment money laundering transactions committed in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and of a money laundering conspiracy in violation of 18 U.S.C. § 1956(h). All those funds are therefore subject to forfeiture and seizure as having been "involved in" those money laundering transactions which were undertaken as a part of a money laundering conspiracy.

- All the funds sought to be seized are therefore subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) (as having been "involved in" money laundering) and (C) (as proceeds), including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and to criminal forfeiture under 18 U.S.C. §§ 981(a)(1)(C) (as proceeds) and 982(a)(1) (as "involved in" money laundering) and 28 U.S.C. § 2461.

- Because all those funds are subject to forfeiture, they are also subject to seizure under both the civil seizure statute, 18 U.S.C. § 981(b), as well as the criminal seizure statutes, 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

**Facts Supporting Finding of Probable Cause for Issuance of Seizure Warrants**

**Background**

7. Agents from Defense Criminal Investigative Service, the Department of Veterans Affairs ("VA") Office of Inspector General, the U.S. General Services Administration ("GSA")

7

Office of Inspector General, the FBI, the U.S. Small Business Administration ("SBA") Office of Inspector General, and Department of Army Criminal Investigation Command ("Army CIC") have investigated a suspected conspiracy to commit crimes involving two federal programs that set aside government contracts for certain disadvantaged groups. The first program is the Small Business Act Section 8(a) Program ("8(a) Program"), established by 15 U.S.C. § 632w and 15 U.S.C. § 15(d), which helps small companies owned and operated by socially and economically disadvantaged persons. The second program is the Service Disabled Veteran Owned Small Business ("SDVOSB") program, established by the Veterans Entrepreneurship and Small Business Development Act of 1999 (15 U.S.C. § 657b) and the Veterans Benefits Act of 2003 (15 U.S.C. § 657f), which helps small businesses owned by service-disabled veterans.

8.      Investigating agents have executed two search warrants at the offices of Sonag, Nuvo, and C3T, one in August 2016 and a second in May 2017.

**SBA 8(a) Business Development Program**

9.      The SBA's 8(a) Business Development Program is intended to help small businesses owned and controlled by socially and economically disadvantaged individuals, gain a foothold in government contracting. The SBA certifies qualified small businesses under the 8(a) Program. Certified 8(a) firms can compete for government contracts that are set aside for 8(a) firms. See 13 C.F.R. §§ 124.101 *et seq.*

10.     The requirements to become certified under the 8(a) Program include the following:

> A.      The business must be majority-owned (51 percent or more) by one or more socially and economically disadvantaged individuals;
>
> B.      The business must be controlled and managed on a full-time, day-to-day basis by one or more disadvantaged individuals who possess the required management capabilities;

8

C.    The business must be small, as measured by the SBA's criteria for small businesses;

D.    The business must demonstrate potential for success, which usually means having at least two years of performance history;

E.    The disadvantaged individuals owning and controlling the business must show good character; and

F.    If any non-disadvantaged individuals are involved in management of the firm, they must not (i) have the power to control the firm, (ii) be a former employer or principal of a former employer of the disadvantaged individual (unless the SBA expressly approves of the relationship); or (iii) receive more compensation than the highest disadvantaged officer.

11.    To become certified under the 8(a) Program, an applicant must submit SBA Form 1010 to the SBA. For continued eligibility in the SBA 8(a) program, a company is required to submit SBA forms 1450 (8(a) Annual Update) and 413 (Personal Financial Statement) on an annual basis. Forms 1010 and 413 include warnings indicating that providing any false information or making any misrepresentations subjects the submitting party to prosecution under 15 U.S.C. § 645 and/or 18 U.S.C. § 1001. SBA relies upon 8(a) applicants to supply truthful information on all forms submitted as part of the application and continued-eligibility processes.

12.    8(a) firms can receive set-aside and sole-source contracts and are also able to form joint ventures to bid on and perform larger prime contracts. All joint ventures must be reported to the contracting agency and the joint venture must still meet the requirements for small business size and control.

13.    Participation in the program is divided into two phases over nine years: a four-year developmental stage and a five-year transition stage. Once a firm graduates from or voluntarily withdraws from the program, it is prohibited from future participation.

**Service-Disabled Veteran-Owned Small Business Program**

14. The Veterans Entrepreneurship and Small Business Development Act of 1999 established an annual government-wide goal of awarding not less than three percent of the total value of all prime contract and subcontract awards to small business concerns owned and controlled by service-disabled veterans. The Veterans Benefits Act of 2003 established a procurement program for Service Disabled Veteran Owned Small Businesses ("SDVOSBs"). This procurement program provides that federal contracting officers may restrict competition to SDVOSBs and award a sole-source or set-aside contract where certain criteria are met.

15. To be eligible for the SDVOSB program, the SDVOSB must meet the following criteria:

       A.    The veteran-owner(s) must have a service-connected disability rating that has been determined by the VA or Department of Defense;

       B.    The veteran-owner(s) must unconditionally own at least 51% of the SDVOSB and ownership must be direct;

       C.    The veteran-owner(s) must be the highest compensated employee of the SDVOSB unless there is logical explanation, submitted by the veteran, as to why taking a lower salary than other employee(s) benefits the business;

       D.    The veteran-owner(s) must control the day-to-day management, daily operations, and long-term decision making of the SDVOSB;

       E.    The veteran-owner(s) must hold the highest officer position in the SDVOSB and control the board of directors, if applicable;

       F.    The veteran-owner(s) must have the managerial and industry experience of an extent and complexity needed to manage the company; and

       G.    The SDVOSB must be small under the NAICS code assigned to the industry in which the SDVOSB purports to be classified (*i.e.*, Industrial Building Construction, Commercial and Institutional Building Construction).

16.     If a business fails to meet any one of these criteria, it cannot be verified by the VA as a SDVOSB and cannot bid on any government contracts, for any government agency, that are set aside under the SDVOSB program.

17.     All owners of the applicant business must submit individual VA Form 0877 as a part of the application. This form includes an admonition that the making of a false, fictitious, or fraudulent certification may render the maker subject to prosecution under 18 U.S.C. § 1001.

18.     During the initial phase of the SDVOSB procurement program, owners of applicant businesses were required to self-certify through government databases that they met the criteria to be eligible to participate in the SDVOSB program. However, beginning in 2011, the VA's Center for Verification and Evaluation ("CVE") began a new verification process that requires applicants to submit materials online. The CVE relies on the truthfulness and accuracy of the documents and statements made by the business owners to determine eligibility for the program.

19.     Beginning in 2011, VA contracts awarded under the SDVOSB set-aside program required businesses to be CVE-verified and listed in the VA's Vendor Information Page website. Other government agencies awarding contracts to SDVOSBs still rely primarily on self-certifications in government databases. Initially, CVE verifications were valid for one year and the concern had to re-apply to have their SDVOSB status renewed. Effective June 27, 2012, CVE verification is valid for two years and then must be renewed.

**Government Databases**

20.     Any business seeking a contract or purchase agreement with the federal government must first register, online, in government-operated databases. These databases are under the authority of the GSA. Before July 2012, prospective contractors were required to

11

register in the Central Contractor Registration ("CCR"), and complete the Online Representations and Certifications Application ("ORCA") prior to being awarded a contract. In July 2012, the CCR and ORCA were combined into the System for Award Management ("SAM").

21. The business must self-certify that it meets the specific requirements related to their status-based assertions, annually or any time there is a substantive change in the accuracy of previous certifications. Each status-based business classification is fully defined with references and hyperlinks to the laws that govern the programs. All entries in these databases are made with the admonition of possible penalties under 18 U.S.C. § 1001. Contracting officials for the VA, DoD, and other government agencies rely upon these certifications prior to awarding set-aside contracts.

## Facts Supporting Findings that the Funds Sought to be Seized are Forfeitable as the Proceeds and Profits Traceable to the Set-Aside Scheme and as Having Been Involved in Financial Transactions Conducted in the Course of a Conspiracy to Engage in Concealment Money Laundering

22. As detailed below, I submit that between no later than June 2004 and continuing through at least August 2016, Brian Ganos ("Ganos"), the President and majority shareholder of Sonag Company, Inc.[2], and Vice President and minority shareholder of Nuvo Construction Company, Inc. ("Nuvo"), with the assistance of other individuals and their affiliated companies, violated federal law by pursuing a scheme to seek and obtain government set-aside contracts for which they were not eligible.

23. Brian Ganos became the owner and president of Sonag Company, Inc. ("Sonag") in 1992. Ganos, as a Hispanic male, qualified as a disadvantaged individual for the

---

[2] Sonag is Ganos spelled backward.

8(a) Program. In 1994, Sonag was granted 8(a) status and became eligible to receive set-aside contracts. In May 2003, Sonag successfully graduated from the program and could no longer bid on 8(a) set-aside contracts. From approximately 1995 until 2008, an individual having the initials "J.H." was a Project Manager for Sonag.

24.     Brian Ganos, with assistance from J.H., L.M., and others, pursued a scheme to defraud the United States by obtaining 8(a) and SDVOSB set-aside government contracts for which they were not entitled. They did so by identifying a former Sonag employee, J.L., and a former C3T employee, O.M., as persons who qualified as disadvantaged individuals, and directing them to become the purported owners of Nuvo and Pagasa, respectively. Once established, both Nuvo and Pagasa successfully applied to the SBA 8(a) program. In addition, Ganos and co-conspirators identified an individual having the initials "T.A.," who met the requirements of a Service Disabled Veteran, to become the purported owner of C3T and qualified to receive SDVOSB set-aside contracts. In reality, however, Ganos and J.H. controlled Nuvo, Pagasa, and C3T, which allowed Ganos and J.H. to financially benefit from contracts that Sonag was not eligible to receive.

25.     A former Sonag employee, L.M., was the contract accountant for Sonag, C3T, Nuvo, and Pagasa. L.M. also participated in the fraud scheme by arranging banking and financial transactions to facilitate the movement of large amounts of money between these companies.

26.     As detailed below, Sonag, Nuvo, C3T, and Pagasa were all co-located in the same building located on the northwest corner of W. Florist Avenue and N. 55th Street in Milwaukee, Wisconsin.

27. Due to the fraudulent creation, management, and affiliation of these companies, between 2005 and approximately April 2016, Ganos and his co-conspirators caused Nuvo and C3T to obtain 8(a) set-aside federal contracts valued at approximately $71 million and SDVOSB set-aside contracts valued at approximately $197 million.

28. Brian Ganos also conspired with L.M. and others to engage in money laundering transactions that concealed the nature, source, ownership, and location of the criminal proceeds obtained through Nuvo and C3T from the government set-aside contracts so that Ganos could financially benefit himself and companies he initiated, solely or jointly. Companies known to be affiliated with Ganos include Trinity Marketing Services, Sonag Ready Mix, Sonag Electrical, LJ Properties, Jax Properties, MC Properties, Eagle Properties, and Grand C Trucking, hereafter referred to as "affiliated companies."

**Nuvo Construction Company, Inc.'s Formation and Operation**

29. In 2014, an individual approached law enforcement with information regarding an inappropriate affiliation between Sonag, Nuvo, C3T, and Pagasa. This individual had been employed by Sonag and Nuvo for approximately 14 years, which gave him/her an intimate knowledge of specific contract details, office culture, and financial transactions. This individual is identified as confidential source "CS-1."

30. CS-1 reported that when Sonag was graduating from the 8(a) Program, Brian Ganos pursued a plan to establish a new company, which would become Nuvo, and place a minority individual in the position of company president so that Nuvo could obtain 8(a) classification and bid on 8(a) set-aside contracts. CS-1 explained that Ganos approached a Sonag employee, J.L., with the offer to become president of Nuvo. J.L. had five years of construction management experience with La Casa Construction Company and was a project

manager for Sonag. According to CS-1, at the time Ganos offered J.L. the position, J.L. was experiencing personal financial hardship and may have been on the verge of losing J.L.'s residence. Therefore, J.L. agreed to become president.

31. Wisconsin DFI records show that in March 2001, J.L. changed the name of Insulation Masters, Inc., a company J.L. had incorporated, to Nuvo. According to Nuvo records submitted to SBA, Brian Ganos became 15% minority owner of Nuvo in April 2001.

32. On June 9, 2004, J.L. submitted Nuvo's initial SBA 8(a) program application on SBA Form 1010. It stated that J.L. was the president of Nuvo, that J.L. had 85% ownership interest in Nuvo, and that "100% of [J.L.'s] hours were devoted to the management of the firm." The form listed Brian Ganos as the V.P./Secretary and stated that Ganos had only a 15% ownership interest.

33. Based on these statements and submitted records, SBA granted Nuvo 8(a) status on September 23, 2004. Nuvo then submitted a business plan to the SBA in October 2004, which upon the SBA's approval, allowed Nuvo to bid on 8(a) set-aside contracts. The business plan again listed J.L. as the president, 85% owner, and full-time manager of the company with an annual salary of $48,000 per year, and listed Brian Ganos as a 15% owner receiving no annual salary at all.

34. As part of Nuvo's participation in the SBA 8(a) program, J.L. was required to submit an annual report to the SBA with updated records to demonstrate Nuvo's continued compliance with the 8(a) requirements. J.L. complied with this requirement and purportedly signed Nuvo's annual review forms from September 2005 through October 2012. In these annual reports, J.L. continued to assert that J.L. was the president of Nuvo, that J.L. was the 85% owner of Nuvo, and that J.L. conducted and managed Nuvo's daily business operations, as

15

required by the 8(a) program. These annual reports also asserted that J.L. was drawing a substantial salary and that Brian Ganos was only a 15% owner and not drawing any salary.

35.    Accompanying some of J.L.'s SBA annual reporting records were copies of J.L.'s IRS Tax Return, Form 1040. These returns show Nuvo as J.L.'s sole source of income. They do not show J.L. as receiving income from any other employment besides Nuvo.

36.    CS-1 reported that J.H., not J.L., actually managed Nuvo. CS-1 also explained that once Nuvo began working on government set-aside contracts, Sonag Construction's business slowed down drastically because the majority of Sonag's personnel began working on Nuvo projects. In addition, CS-1 reported that Brian Ganos provided the financial backing for Nuvo.

37.    Nuvo's office is located in an office suite next to Sonag's suite in a single-story office complex owned by Sonag I, LLC, a company owned by Brian Ganos. This office complex is located at 5500 W. Florist Avenue, Milwaukee, Wisconsin. Nuvo pays Sonag I monthly rent for Nuvo's use of the office suite and warehouse area in the office complex.

38.    CS-1 reported that shortly after Nuvo was granted 8(a) status in 2004, Nuvo's purported president, J.L., moved to Worthington, Minnesota, with J.L.'s family. CS-1 further reported that since he moved to Minnesota, J.L. has had only limited involvement with Nuvo.

39.    The investigation has corroborated that J.L. lived in Minnesota and worked for another employer in Minnesota during the period when J.L. purported to be the day-to-day manager of Nuvo.

40.    For example, J.L.'s Tax Return, IRS Form 1040, for 2004, revealed that J.L. and J.L.'s family had moved from Wisconsin to 1XXX 5th Avenue in Worthington, Minnesota in July 2004. J.L.'s Tax Returns from 2007, 2009, and 2010 indicate J.L. resided at 32XXX 210th Street in Worthington, Minnesota.

16

41. Likewise, J.L. has had a Minnesota Driver's License since 2006. According to the Minnesota Department for Public Safety, J.L. obtained a Minnesota Driver's License on November 20, 2006, which was renewed on November 17, 2010, and again in November 25, 2014. On J.L.'s original Minnesota Driver's License application, dated November 20, 2006, and on subsequent renewal applications, J.L. reported J.L.'s home address was 32XXX 210th St, Worthington, Minnesota.

42. J.L. also has a full-time job in Minnesota. Internet searches show that J.L. has been employed in Minnesota by the Southwest Minnesota Housing Partnership ("SWMHP"), located at 2401 Broadway Ave, Suite 4, Slayton, Minnesota, during the same time period J.L. purported to manage Nuvo full time. SWMHP's LinkedIn page states that it is a "non-profit green developer with over 20 years of experience in developing and preserving affordable housing in Minnesota." SWMHP maintains a website at www.swmhp.org. A review of the SWMHP website revealed two staff rosters. One roster dated April 2, 2009, identified J.L. as the Senior Project Manager in the Construction Division. The second roster, dated July 2014, identified J.L. as the Director of Construction Services. The website also provided a group picture of the staff with a list of the names of the individuals pictured. Also contained in the SWMHP website was a group image of the staff, which included an image of J.L., titled "Southwest Minnesota Housing Partnership 1992-2008." The person identified as J.L. in the SWMHP images appears to be the same person depicted on J.L.'s Minnesota driver's license, J.L., the purported president of Milwaukee-based Nuvo.

43. Documents obtained by SWMHP corroborate that J.L. planned to work full-time for SWMHP in Minnesota even before submitting Nuvo's initial SBA 8(a) program application on June 9, 2004. Specifically, on June 7, 2004, J.L. accepted an offer of employment as a Senior

17

Project Manager with SWMHP. The employment documents reflect that this was a full-time permanent position with full benefits including health insurance, retirement fund, and paid time off. It reflects that J.L. began his employment with the SWMHP on July 12, 2004.

44. A review of Nuvo financial records and contract documents between J.L. and SWMHP indicated that J.L. was receiving income from SWMHP but concealing its source by transmitting it through Nuvo's business checking account. According to those records, between January 2005 and July 2016, SWMHP paid Nuvo approximately $976,572.87 into Nuvo's checking account. During that same time period, Nuvo issued monthly payroll checks to J.L., thereby passing the SWMHP compensation to J.L. Documents recovered during the August 3, 2016 search warrant of Nuvo's office space corroborate this arrangement and confirm that payments from Nuvo to J.L. during that time period totaled approximately $1.6 million. Of that amount, approximately $976,572.87 came from SWMHP and only approximately $600,000 came from Nuvo. The annual amount that Nuvo paid to J.L. (excluding compensation from SWMHP that passed through Nuvo) was variable but averaged $55,594 during the 11 years reviewed, making J.L.'s actual Nuvo compensation less than the Nuvo compensation paid to multiple other Nuvo employees, even though J.L. was purportedly the owner and highest-paid employee.

45. As part of Nuvo's annual reports to SBA from 2005 to 2012, J.L. was required to submit a Personal Financial Statement and a Statement of Personal History. J.L. reported compensation from Nuvo, but in none of those annual reviews did J.L. report compensation from SWMHP.

46. On those annual submissions, J.L. provided SBA with conflicting information regarding J.L.'s address of residence. On J.L.'s 2005, 2006, and 2007 reports, J.L. listed J.L.'s

18

residence as 3XXX South 5th Place, in Milwaukee, Wisconsin. On J.L.'s 2008, 2009, and 2010 reports, J.L. listed J.L.'s residence as S70 W17XXX Muskego Drive, Muskego, Wisconsin. And on J.L.'s 2011 and 2012 reports, J.L. listed J.L.'s address as 32XXX 210th Street, Worthington, Minnesota. But on J.L.'s 2012 report, J.L. stated that from August 2003 until July 2007, J.L. lived at 3XXX South 5th Place, in Milwaukee, Wisconsin, and that from July 2007 until October 2012, J.L. lived at 32XXX 210th Street in Worthington, Minnesota.

47.     When interviewed, SBA officials who administer the 8(a) program in Wisconsin stated that they did not realize that J.L. resided in Minnesota. They further stated that if they had realized that fact, they would have questioned whether J.L. was actually fulfilling the requirement to be the full-time, day-to-day manager of Nuvo.

48.     CS-1 reported that, from 2004 to the present, J.L. has exercised no control over and rarely visited Nuvo. Rather, J.L. relied on other employees for information about the day-to-day operation of Nuvo. However, to create the illusion that J.L. was controlling Nuvo, an office was maintained for J.L. in the building, with personal effects and papers on the desk.

49.     Another former Nuvo employee corroborated CS-1's statements. This former employee worked at Nuvo from late summer 2013 to early spring 2014. This former employee stated that J.L. was never at Nuvo, despite having an office there. The former employee reported seeing awards and plaques with J.L.'s name on them in the Nuvo office. The former employee believed J.L. was merely a name being used so Nuvo could maintain 8(a) status, because he/she did not know anyone at Nuvo who had met or knew J.L. The former employee heard other employees tell callers that J.L. was not in the office, and those employees would then assist the callers. Nuvo employees did not contact J.L. about the calls, they just handled the business themselves. Based on what he/she heard from fellow employees, and what he/she witnessed

19

while working at Nuvo, the former employee believed that Brian Ganos actually owns the company, not J.L.

50.   CS-1 reported that J.H. – not J.L., Nuvo's supposed president – actually managed Nuvo. For example, in February 2012, J.H., Vice President of C3T, fired an individual having the initials "T.B.," a Nuvo Project Manager, for charging personal expenses onto T.B.'s assigned Nuvo company credit card.

51.   CS-1 reported that emails relating to Nuvo business were sent to and from an email address that appeared to belong to J.L., but that was in fact controlled by L.M., the contract accountant for Sonag, C3T, Nuvo, and Pagasa. In corroboration of this statement, CS-1 provided a photocopy of an email sent from an email address purportedly belonging to J.L., XXXXez@Nuvoconstruction.com, on October 10, 2013. The email body consisted of a request from L.M. for information, receipts, and job numbers for the contract attached to the email. That information was to be returned to L.M., even though the email message came from J.L.'s email address.

52.   CS-1 recounted that in November 2013, a couple months after Nuvo had graduated from the 8(a) program, Nuvo employees were issued Sonag email addresses and were instructed to use Sonag email addresses when conducting Sonag business.

53.   In corroboration of CS-1 statements, the other former Nuvo employee reported that, from late summer 2013 through early spring 2014, Sonag and Nuvo routinely and inappropriately shared bid information with each other. The former employee was instructed by individuals having the initials "S.H." and "B.W.," who are Assistant Project Managers for Nuvo, to do things like send bid paperwork from the Sonag fax machine instead of the Nuvo fax machine and pick up bid information from Sonag, even though Sonag was a direct competitor of

20

Nuvo. According to the former employee, bid day was chaotic, and there was bid information going back and forth between Nuvo and Sonag. The former Nuvo employee said many Nuvo employees were given duplicate Sonag email addresses. Sonag and Nuvo also shared computers and printers.

54. As part owner of Nuvo, Brian Ganos was required to submit SBA 8(a) annual reports to ensure Nuvo's eligibility in the program. A review of SBA records revealed that Brian Ganos complied with this requirement and mailed in the forms. Specifically, on his SBA form 1450, Individual Compensation Worksheet, Brian Ganos indicated that from 2008 through 2011, he received no compensation from Nuvo. Brian Ganos also submitted SBA form 1010, Individual Information, and he reported that during 2011 and 2012, he did not have authorization to make withdrawals from, or have access to, Nuvo's bank account. However, a review of Nuvo's financial records disclosed that from March 2009 through August 2009, Nuvo paid Brian Ganos a total of $139,304 and Brian Ganos was an account holder and authorized signer on Nuvo's financial accounts from December 2011 through August 2016.

55. Moreover, documents obtained during the August 2016 and May 2017 executions of search warrants at Nuvo offices indicate that Ganos in fact drew significant amounts of funds from Nuvo for his personal benefit. For example, documents seized during those searches reflect that Nuvo paid for Ganos' personal insurance expenses, including homeowner's insurance, personal valuables, and vehicle and boat insurance policies. The following are examples of such insurance payments that Nuvo made for Ganos' personal benefit:

> A. On July 3, 2012, check number 12727, in the amount $3,646.00, was written from Nuvo to Hagerty Insurance Agency for insurance for Ganos'

21

1956 Chevrolet Bel Air, 1967 Ford Mustang Shelby and a 1969 Chevrolet
Camaro.

B. On April 1, 2013, check number 13514, in the amount of $1,362.00, was
written from Nuvo to Foremost Insurance Company for Ganos' watercraft
insurance.

C. On July 17, 2013, check number 14002, in the amount of $5,592.00, was
written from Nuvo to Chubb Group Insurance for Ganos' Home and
Valuable Articles Insurance.

D. On July 23, 2014, check number 15351, in the amount of $6,272.00, was
written from Nuvo to Chubb Group Insurance for Ganos' Home and
Valuable Articles Insurance.

E. On July 23, 2014, check number 15355, in the amount of $2,260.00, was
written from Nuvo to Hagerty Insurance Agency for insurance for Ganos'
1967 Ford Mustang Shelby and a 1969 Chevrolet Camaro.

F. On July 6, 2015, check number 16952, in the amount of $6,330.00, was
written from Nuvo to Chubb Group Insurance for Ganos's Home and
Valuable Articles Insurance.

56.     CS-1 reported that Brian Ganos' wife, who has the initials "G.G.," is on Nuvo's
payroll even though G.G. never actually worked for Nuvo. CS-1 believed that Brian Ganos had
his wife G.G. added to Nuvo's payroll so he could covertly earn income from Nuvo. A review
of G.G.'s IRS form W-2s revealed that from 2009 through 2012, Nuvo paid G.G. approximately
$200,000.

57.     A review of property records revealed that on August 31, 2009, Nuvo purchased a residential property at S70 W17XXX Muskego Drive, Muskego, Wisconsin. To facilitate the purchase, Nuvo secured a mortgage from Tri City National Bank in the amount of $392,000. The mortgage was signed by Brian Ganos, Vice President, Nuvo Construction Company, Inc. Contained in the mortgage records was a letter purportedly written by J.L., President of Nuvo Construction Company, giving Brian Ganos full authorization to sign all documents on behalf of Nuvo for the purchase of the property. This letter was endorsed with a stamp of J.L.'s signature. The property purchased by Nuvo at S70 W17XXX Muskego Drive, Muskego, Wisconsin, is adjacent to lakefront property owned by Brian Ganos and where Brian Ganos' permanent residence is located, S71 W17XXX Lake Drive, Muskego, Wisconsin.

58.     Review of property records indicates that Brian Ganos purchased the lakefront portion of the property owned by Nuvo, on April 1, 2011, and consolidated this lakefront property with his personal property at S71 W17XXX Lake Drive, Muskego. According to Waukesha County Register of Deeds records, Brian Ganos paid Nuvo $120,000 for the land. However, a review of Nuvo's BMO Harris bank account statements revealed no evidence of a $120,000 payment received by Nuvo from Brian Ganos or any of Brian Ganos' affiliated companies. The transfer was made via quit claim deed, which was signed by Brian L. Ganos as Vice President for Nuvo.

59.     Additionally, CS-1 reported that Brian Ganos and J.H. have had numerous repairs and additions to their personal residences performed by Sonag, Nuvo, C3T, and outside contractors. CS-1 believed the invoices for the material and labor on these projects were placed on legitimate United States government contracts awarded to Nuvo and C3T.

60.     In support of this statement, CS-1 provided an internal Nuvo accounting document for the September 2010 Department of the Army contract Nuvo was awarded to construct the Renard Island Temporary Causeway in Green Bay, Wisconsin. A review of the document revealed a $50,000 payment, reflected as a cost incurred on the project, to JDJ Builders, Inc., a residential home remodeling company located in Greenfield, Wisconsin. CS-1 reported that JDJ Builders did not perform any work on this causeway construction contract and, further, that the causeway construction contract did not include home remodeling or rough framing.

61.     During this same time period, JDJ Builders filed permits to conduct $250,000 worth of remodel work at Brian Ganos' residence. A review of Nuvo's financial records revealed that from March 2011 through December 2011, Nuvo wrote seven checks to JDJ Builders for a combined total of approximately $640,000.

**Nuvo's Government Contracts**

62.     A review of the Federal Procurement Database in April 2016 revealed that from 2005 to 2015, Nuvo received a combined total of approximately $71 million in 8(a) set-aside contracts. The majority of these contracts were awarded by the VA and Department of Defense.

63.     Nuvo made yearly certifications on ORCA, and later through SAM, that it was an SBA 8(a) company. Available records beginning January 4, 2005, identify that J.L. purportedly made these certifications. Moreover, available records beginning in September 2011, reveal that J.L. purportedly made these certifications from the IP address of 67.53.131.78. Subscriber records show that this IP address was issued to and paid for by Sonag at the building located at 5500 W. Florist Ave., Milwaukee, Wisconsin. J.L.'s purported last certification was

24

made on July 22, 2015, from IP address 24.167.199.138, which was also issued to and paid for by Sonag at the same location and address.

64. VA and Department of Defense contracting officials primarily relied on Nuvo's self-certification submissions to determine eligibility to bid upon and receive contracts. Below are federal government 8(a) set-aside contracts that Nuvo received based upon Nuvo's certifications from August 2011 through March 2016:

| | | | | | | |
|---|---|---|---|---|---|---|
| W911SA10D0002 | ARMY | 10/27/2011-9/26/2013 | $1,022,736.36 | YES | J.L. | Sonag |
| W912J208D0001 | ARMY | 11/22/2011-11/30/2012 | $310,420.37 | YES | J.L. | Sonag |
| W912EK11C0079 | ARMY | 8/9/2011-5/10/2012 | $1,788,373.37 | YES | J.L. | Sonag |
| W911SA12D0008 | ARMY | 8/24/2012-3/3/2016 | $2,117,828.01 | YES | J.L. | Sonag |
| W911SA12D0010 | ARMY | 9/14/2012 -9/27/2012 | $869,461.62 | YES | J.L. | Sonag |
| W911SA12P0221 | ARMY | 9/27/2012 -9/26/2015 | $91,908.00 | YES | J.L. | Sonag |
| W911SA12C0013 | ARMY | 09/28/2012 | $356,458.00 | YES | J.L. | Sonag |
| W911SA13D0011 | ARMY | 9/26/2013-3/14/2016 | $1,010,483.31 | YES | J.L. | Sonag |
| | | Total | $7,567,669.04 | | | |

65. The DoD's Defense Finance and Accounting Service ("DFAS") issues electronic payments to contractors by means of wire to their respective financial accounts and retains a voucher as a record of the payment. DoD contractors must be registered in the Central Contractor Registration ("CCR") and agree to receive payments electronically.

66. On September 23, 2013, Nuvo graduated from the program and was thereafter prohibited from bidding on 8(a) set-aside contracts. But Nuvo continued to submit claims and to

receive payments on previously awarded contracts as shown in the table above. Specifically, in the last five years, Nuvo submitted claims seeking approximately \$4.9 million on the above 8(a) contracts from October 2012 through July 2016.

**C3T, Inc.'s Formation and Operation**

67.     CS-1 reported that after Nuvo was established, Brian Ganos and J.H. wanted to create a SDVOSB in order to participate in the new SDVOSB government set-aside contract program through the VA. As a result, in 2006, Brian Ganos and J.H. selected and placed T.A., a service-disabled veteran, in the position of President of C3T to qualify for the SDVOSB program.

68.     During a CVE site visit in May 2012, J.H. was interviewed. J.H. stated that while J.H. was doing business for Sonag at the VA, J.H. met T.A., who was then working for the VA Facility Management. J.H. stated that J.H. and T.A. decided to start C3T as quickly as possible, by using an established Ganos company, Sonag Masonry, and changing the name to C3T. J.H. and T.A. leased office space from Brian Ganos, through Sonag I, in the building located at 5500 W. Florist Avenue, Milwaukee, Wisconsin. This office space is adjacent to and in the same building as the offices of Sonag and Nuvo.

69.     During that same CVE site visit, T.A. was interviewed. T.A. confirmed that T.A. had met J.H. while attending VA contractor meetings. T.A. stated that T.A. started talking with J.H., and they "ended up doing this." T.A. explained they both saw the advantages in starting a business together to obtain government contracts. T.A. stated that "he went immediately from working for the VA to [J.H.]," and "[J.H.] was a veteran, so [T.A.] felt he could trust [J.H.]."

70.     On April 3, 2006, C3T, Inc. was established and T.A. was listed as 51% owner, while J.H. was listed as 49% owner. According to the Wisconsin Department of Financial

26

Institutions, C3T was originally a Ganos-owned company with various different names. On April 3, 2006, the corporate records were amended to reflect a name change to "C3T, Inc." and a change of registered agent from Brian Ganos to J.H. The records state that Brian Ganos transferred, for free, 51% of the company's stock to T.A. as President of C3T, and 49% to J.H. as Vice President of C3T.

71. After C3T was established in April 2006, J.H. registered C3T as a self-certified SDVOSB in government databases, which SDVOSB registration allowed C3T to successfully bid on SDVOSB set-aside government contracts.

72. On July 8, 2008, C3T applied for CVE's verification of the companies' SDVOSB status and inclusion in the verified veteran business database Vendor Information Page. On August 20, 2008, C3T's SDVOSB status was verified and C3T was added to the database.

73. On February 24, 2009, CVE sent a letter to C3T requesting clarification as to what, if any, was their relationship with Nuvo and why there were many corporate similarities between C3T and Nuvo, including a common fax number. On February 26, 2009, T.A. reported, "there is no relationship between C3T and Nuvo Construction Company, Inc. C3T, Inc. does not share any ownership, management or control with Nuvo Construction Company, Inc. . . . With the exception of a small amount of labor Nuvo Construction, Inc. provided on one C3T, Inc. project (less than $3,500), we have not subcontracted work to, or received any work from, Nuvo Construction Company, Inc." However, a review of C3T's financial records revealed that in 2008, C3T received approximately $435,000 from Nuvo.

74. In January 2010, a former C3T employee was interviewed and reported he/she had worked for C3T for two years, from approximately 2008 through 2010. The former employee explained that he/she had never met T.A. – who was C3T's ostensible president – and

27

that all the other employees considered Brian Ganos and J.H. the bosses of C3T. The employee reported that C3T was started by Brian Ganos and was operated jointly by Brian Ganos and J.H. The former employee also stated that tools and equipment that were originally stenciled with Sonag and Nuvo company names were repainted with C3T's company name.

75. A review of Waukesha County Register of Deeds, financial, and real estate records revealed that on January 4, 2010, C3T purchased a townhome located at W171 S7XXX Lannon Drive, Muskego, Wisconsin, at a bank sale for $150,000. Three days later, on January 7, 2010, C3T sold the property to individuals having the initials "J.G." and "S.G.," Brian Ganos' son and daughter-in-law, for $130,000. However, according to the January 8, 2010, Uniform Residential Appraisal Report, the property was valued at $185,000. Bank documents associated with the sale of the property indicate that the required bank and property documents were signed by J.H., Vice President of C3T. The sale of this property was finalized on February 22, 2010. According to mortgage records, Brian Ganos gifted his son and daughter-in-law $22,000 towards the purchase of the property.

76. In May 2010, T.A. and J.H. completed their respective VA form 0877s, certifying that T.A. was a service-connected disabled veteran and 51% owner and controller of C3T, while J.H., who was a veteran, was 49% owner and controller of C3T.

77. In September 2010, a non-winning SDVOSB bidder filed a protest with SBA regarding C3T's status as an SDVOSB, alleging an improper affiliation between C3T, Nuvo, and Sonag. SBA asked T.A., as C3T's ostensible president, to provide a response. T.A. stated that C3T subcontracted work to Sonag in 2009 for a combined total of $344,540. T.A. also reported that "No other company has any control, management, ownership, or interest in C3T. C3T does not share any ownership, management, control or interest in any business that physically resides

in or near the same location as C3T, Inc." Brian Ganos completed a letter attesting that Ganos "do[es] not own any stock in C3T, Inc., nor has any type of ownership interest, management or control of C3T, Inc." After reviewing C3T's company records and the statements provided, SBA determined that there was no affiliation between the companies and dismissed the protest. A review of C3T's financial records revealed that C3T actually had paid Sonag $475,000 in 2009, far more than T.A. had stated to SBA.

78.     CS-1 reported that T.A. did not actually run day-to-day operations at C3T, and was not physically present in the building for months at a time. CS-1 reported that CVE suspended C3T's SDVOSB status for over one year in 2012 due to suspicion that T.A. was not the true owner. According to CS-1, T.A. then began to come to C3T's office on a regular basis. As soon as C3T was re-verified as a SDVOSB in February 2013, however, T.A. stopped coming to the office.

79.     CVE documents show that CVE suspended C3T's SDVOSB status on April 2, 2012, because T.A. had failed to submit the required biannual re-verification paperwork. In May 2012, T.A. submitted C3T company records to become re-verified. CVE then conducted a site visit and decided not to reinstate C3T's SDVOSB's status. CVE explained that it was unable to confirm that T.A. was in control of C3T, as T.A. did not have any apparent experience in the construction industry before establishing C3T, while J.H. had 21 years of experience in construction. T.A. had told the examiner T.A. had "an idea of things in regards to construction, but [J.H.] was the expert." T.A. also told the examiner that T.A. was learning on the job, relying on L.M.'s expertise in accounting and J.H.'s expertise in construction. T.A. was unable to answer the examiner's questions regarding payroll and subcontracting, but instead directed the examiner to L.M. and J.H. for the requested information.

80. During this site visit, the examiner discovered that, according to C3T's 2011 W-2 statements, T.A. earned $85,568 from C3T, while J.H. earned $128,457 from C3T. According to the program rules, T.A., as president of C3T, was required to be the highest compensated employee of the company. When the site examiner questioned T.A. on this issue, T.A. reported that T.A. received an additional $50,000 from C3T in 2011. T.A. provided CVE with a letter from C3T's CPA reporting that C3T had issued a 1099 to T.A. for $50,000 in 2011. However, a review of both C3T's and T.A.'s financial records revealed no evidence of any transfer of $50,000 to T.A. in 2011, whether by check, cash withdrawal, or electronic money transfer. In addition, a review of C3T's tax records from 2010 through 2013 revealed no 1099 issued by C3T for $50,000.

81. A review of Nuvo and C3T bank accounts revealed that both companies had transferred money from their checking accounts into a BMO Harris account titled "Sonag Joint PPD" every seven days to cover weekly payroll expenses.

82. A review of C3T records submitted to CVE revealed that C3T rented office space from Sonag I, LLC, a property management company owned by Brian Ganos. In July 2012, FBI agents interviewed Brian Ganos as C3T's landlord. Brian Ganos reported that Ganos has no financial interest or investment in C3T other than as the landlord.

83. Brian Ganos also reported that Sonag has no business affiliation or joint ventures with C3T, nor a mentor relationship. Brian Ganos advised that Sonag does occasional subcontracting work for C3T, due to complementary business capabilities.

84. Contrary to Brian Ganos' claim that Sonag occasionally does subcontracting work for C3T, a review of C3T's financial records revealed that C3T in fact had paid Sonag and Sonag Electric a combined total of approximately $2.7 million between June 2011 and October 2012.

30

These payments, set forth in the table below, are not rent or utility payments because C3T pays Sonag I rent on a monthly basis. These payments do not appear to have been made for any legitimate business purpose of C3T.

## Payments from C3T to Sonag

| Date | Amount | Payment Originated | Payment Received By |
|------|--------|--------------------|--------------------|
| 06/14/2011 | $66,000.00 | C3T, Inc. | Sonag Company Inc. |
| 06/15/2011 | $40,000.00 | C3T, Inc. | Sonag Company Inc. |
| 07/07/2011 | $110,000.00 | C3T, Inc. | Sonag Company Inc. |
| 07/29/2011 | $50,000.00 | C3T, Inc. | Sonag Company Inc. |
| 08/31/2011 | $110,000.00 | C3T, Inc. | Sonag Company Inc. |
| 09/30/2011 | $66,000.00 | C3T, Inc. | Sonag Company Inc. |
| 11/02/2011 | $70,000.00 | C3T, Inc. | Sonag Company Inc. |
| 11/10/2011 | $360,000.00 | C3T, Inc. | Sonag Electric * [3] |
| 12/16/2011 | $319,200.00 | C3T, Inc. | Sonag Electric * |
| 12/21/2011 | $48,905.58 | C3T, Inc. | Sonag Electric * |
| 01/09/2012 | $135,000.00 | C3T, Inc. | Sonag Electric * |
| 01/27/2012 | $385,000.00 | C3T, Inc. | Sonag Company Inc. |
| 03/01/2012 | $25,000.00 | C3T, Inc. | Sonag Company Inc. |
| 03/09/2012 | $140,000.00 | C3T, Inc. | Sonag Company Inc. |
| 03/30/2012 | $200,000.00 | C3T, Inc. ** [4] | Sonag Company Inc. |
| 04/17/2012 | $147,844.42 | C3T, Inc. | Sonag Company Inc. |

[3] (*) Checks written to Sonag Electric that were deposited into Sonag Company Inc.'s BMO Harris bank account.

[4] (**) Electronic transfers from C3T's bank account to Sonag Company, Inc.'s BMO Harris bank account.

| 04/30/2012 | $125,000.00 | C3T, Inc. ** | Sonag Company Inc. |
| 06/28/2012 | $204,853.22 | C3T, Inc. | Sonag Electric * |
| 10/18/2012 | $100,000.00 | C3T, Inc. | Sonag Company Inc. |
| **Total:** | **$2,702,803.22** | | |

85. That Brian Ganos and Sonag Co. control C3T and Nuvo is further demonstrated by the fact that Ganos engaged an outside accountant to prepare annual *combined* financial statements for the companies. In addition, a document prepared by this outside accountant reports that a total of $6,044,119 had been "advanced to Sonag" by C3T from December 15, 2007, through March 31, 2014.

86. In response to CVE's decision to suspend C3T's SDVOSB status, T.A. submitted a request for reconsideration on July 5, 2012. In the letter, T.A. reported that T.A. alone had founded C3T in 2006, and that he did not hire J.H. until 2008. On November 2, 2012, C3T's request for reconsideration was denied because T.A.'s statements in the letter contradicted previous statements T.A. had made to CVE and were in direct conflict with company records that C3T had submitted to CVE reporting that both T.A. and J.H. had founded C3T in March 2006. CVE determined that T.A. did not provide enough evidence to prove that T.A. controlled C3T.

87. Further review of the July 2012 reconsideration letter revealed that T.A. had reported that it was T.A.'s decision in January 2012 to change the company's 401(k) vehicle from ADP to Transamerica. T.A. reported that J.H. had no influence or authority in managing this area within C3T. However, a review of Transamerica Retirement Services Corporation Contract Agreement with C3T disclosed there are two agreements in place – one agreement signed by L.M. on February 3, 2011, and a second agreement signed by J.H. on September 6,

32

2011. Notably, neither of those 401(k) agreements was signed by T.A., the supposed president of C3T.

88.     CS-1 reported that in approximately December 2012, J.H. was removed from C3T's payroll, business structure, and office space to create the illusion that J.H. was no longer affiliated with C3T and that T.A. alone owned and controlled C3T. On January 8, 2013, T.A. submitted updated company records to CVE and a request for re-verification of C3T's SDVOSB status. T.A. reported that T.A. was now the sole owner of C3T and J.H. was no longer affiliated with the company. Based on these submissions, C3T's SDVOSB status was reinstated on February 22, 2013. Subsequently, C3T has received substantial additional SDVOSB set-aside contracts and payments, as detailed in the table below.

89.     CS-1 reported that, in truth, J.H had moved into a newly built office space in C3T's warehouse area located behind C3T's office suite, and that J.H. continued to control and manage day-to-day operations of C3T.

90.     During C3T's 2015 re-verification process, CVE conducted a site inspection, records review, and interview of T.A. During the interview, T.A. acknowledged that J.H. was still involved with C3T, but asserted that J.H. was no longer an owner or in control of C3T, and instead was merely an employee, working as a project manager.

91.     A review of the subcontractor lists that C3T had submitted to CVE suggests that C3T also concealed its relationship with Pagasa and Sonag. Specifically, C3T reported that, in 2014, C3T had subcontracted only $23,395 to Pagasa. However, according to C3T's financial records, C3T actually had paid Pagasa approximately $210,000 during 2014. Likewise, C3T reported that C3T had not subcontracted work to Sonag during 2014 and 2015. But, in fact, C3T had paid Sonag approximately $101,000 in 2014 and approximately $93,000 in 2015.

33

92. In addition, C3T did not report any subcontractor work with Trinity Marketing Services, a Ganos-owned company, but C3T issued three checks to Trinity Marketing Services totaling $85,000 in 2015.

93. It appears that Ganos arranged for these payments to Trinity Marketing Services as a means of surreptitiously diverting profits from C3T to himself for his personal benefit. For example, in an email dated July 28, 2015, Ganos directed L.M. to pay $50,000 to Trinity Marketing Services. A review of Trinity Marketing Services, Inc. financial records revealed that it is a Ganos-owned C Corporation established in July 2010. Brian Ganos is the only authorized signer on the account, and the address listed on the account is Brian Ganos' residence at S71 W17XXX Lake Drive, Muskego, Wisconsin. A review of the account activity revealed numerous personal expense payments, such as cosmetic surgery, and payments to Holz Motors, Inc. (an auto dealership in Hales Corners, Wisconsin), Hanna Trailer & RV Supply, Milwaukee Harley Davison, Mirage Casino Hotel, Water Bugs Ski Club, Zephyr Mountain Lodge Association, and cash withdrawals. Thus, Ganos strongly appears to have diverted C3T profits to himself, via Ganos' Trinity Marketing C Corporation.

94. In August 2016, as a result of this investigation, a search warrant was executed at the 5500 W. Florist Avenue building. Subsequently, T.A. attempted to take control of C3T and someone removed C3T's files from the 5500 W. Florist Avenue building.

**C3T's Government Contracts**

95. A review of the Federal Procurement Database revealed that from May 2006 through April 2016, C3T received approximately $197 million in SDVOSB set-aside contracts.

96. C3T made yearly certifications on ORCA, and later through SAM, that it was an SDVOSB. Available records beginning on April 26, 2006, through June 4, 2011, identify that

34

J.H. made these certifications. Available records identify that on May 21, 2012, T.A. made this certification from the IP address of 67.53.131.78. Subscriber records show that this IP address was issued to, and paid for by, Sonag at the building located at 5500 W. Florist Avenue, Milwaukee, Wisconsin. The certification made by T.A. on May 20, 2015, was from IP address 24.167.199.138. Subscriber records reveal that this IP address was also issued to, and paid for by, Sonag at the same location and address.

97.    VA and Department of Defense contracting officials primarily relied on C3T's self-certifications to determine C3T's eligibility to bid upon and receive status-based contracts. Below are federal set-aside SDVOSB contracts that C3T received based upon their certifications from April 2012 through March 2016:

| | | | | | | |
|---|---|---|---|---|---|---|
| W911SA12D0015 | ARMY | 9/25/2012-3/23/2016 | $816,256.18 | YES | T.A. | Sonag |
| VA26314C0058 | VA | 12/5/2012-12/23/2015 | $8,968,675.00 | YES | T.A. | Sonag |
| VA69D12C0084 | VA | 4/15/2012-2/19/2013 | $1,033,713.87 | YES | T.A. | Sonag |
| VA69D13C0150 | VA | 3/27/2013-4/11/2014 | $890,332.00 | YES | T.A. | Sonag |
| VA26313C0191 | VA | 6/28/2013-2/17/2015 | $965,185.87 | YES | T.A. | Sonag |
| VA26313C0214 | VA | 07/30/2013 | $1,375,454.00 | YES | T.A. | Sonag |
| VA26314C0054 | VA | 3/21/2014-10/14/2015 | $2,787,500.85 | YES | T.A. | Sonag |
| VA69D14C0229 | VA | 6/27/2014-10/27/2015 | $2,338,436.00 | YES | T.A. | Sonag |
| | | **Total** | **$19,175,553.77** | | | |

98.    The contract payments listed above were for progress payments, task orders, and/or modifications to SDVOSB set-aside contracts awarded to C3T. These contract payments

35

originated from the VA through the U.S. Treasury and the Department of Defense through DFAS. Once payments were authorized by the agency, the funds were electronically transferred to C3T's account at BMO Harris Bank.

99. In order to do business with the VA, a contractor must be registered and given a VA Vendor Identification. When it is time to release a payment to a contractor, a VA contracting officer submits a request for payment through the VA's Financial Service Center to the U.S. Treasury's Financial Management System. Treasury, in turn, causes an electronic payment to be released from the Federal Reserve Bank in New Jersey to the contractor by means of wire to their respective financial account. The VA retains a voucher as a record of payment.

**Pagasa's Formation and Operation**

100. Brian Ganos, as a former participant in the 8(a) program, is not eligible to be a majority owner of a different 8(a) company. CS-1 reported that since Nuvo graduated from the 8(a) set-aside program in 2013, Brian Ganos and J.H. have sought to establish a new minority-owned business to obtain government 8(a) set-aside contracts.

101. I submit that evidence shows that Pagasa was being supported by Brian Ganos' affiliated companies as part of Ganos' efforts to establish Pagasa as an ongoing concern so that Pagasa, in turn, could fulfill the SBA regulations that require a small business have at least two years of successful work history before requesting SBA 8(a) status.

102. According to the Wisconsin Department of Financial Institutions, Pagasa registered with the state of Wisconsin on May 23, 2012. Pagasa's president and purported owner was an individual having the initials "O.M.," an Asian-Pacific American female who meets the social and economic requirements to be an 8(a) participant. CS-1 reported that O.M. was chosen

36

by Brian Ganos because O.M. had been a project manager for C3T for approximately four years and has a college degree in construction management.

103. On October 10, 2013, O.M. registered Pagasa on the GSA managed database SAM at business address 2XXX S. 58th Street, West Allis, Wisconsin. However, GSA captured the IP address from O.M.'s certification as 67.53.131.78, which is a Sonag-owned IP account, located in the Milwaukee building owned by Brian Ganos, that houses Sonag, Nuvo, and C3T. O.M. certified under penalty of perjury that Pagasa meets all the requirements to be eligible to be an 8(a).

104. On February 23, 2015, O.M. applied for Pagasa's 8(a) certification through the SBA website, reporting that O.M. was the president and 100% owner of the company, and listing Pagasa's address as 2XXX S. 58th Street, West Allis, Wisconsin.

105. On O.M.'s SBA profile, O.M. reported that O.M. was a Project Manager for C3T from 2009-2011. However, C3T's employee payroll report showed that in 2012, while O.M. claimed to be running Pagasa, O.M. received $32,608.17 in income from C3T.

106. O.M. also submitted to the SBA an organization chart that listed J.H. as O.M.'s project manager and estimator. Although 8(a) program rules require O.M. to be the highest paid employee of the company, records showed that J.H. had received more compensation from Pagasa in 2013 and 2014 than O.M. had received. O.M. explained to SBA that J.H. had made more money than O.M. in 2013 due to a project J.H. secured, and in 2014 due to the premature birth of O.M.'s son, which caused O.M. to be off of work for a significant amount of time.

107. CS-1 reported that J.H. was endeavoring to establish a work history for Pagasa by obtaining small state and county projects. Once Pagasa received 8(a) status, J.H. was expected to return to C3T, which J.H. did in 2014.

37

108.    Pagasa's SBA records contained a list of contracts Pagasa participated in from March 1, 2013, through August 1, 2014. The list identifies 13 projects, five of which were for LJ Properties, a Ganos-owned company, which paid Pagasa a combined total of $235,960. One of the contracts listed was for C3T, which paid Pagasa $125,000. O.M. provided a personal statement in which O.M. reported there was no affiliation between Pagasa and C3T.

109.    Pagasa's financial records revealed that from September 12, 2012, through September 12, 2014, Pagasa had received $412,995 from C3T, which contradicts O.M.'s submission to the SBA that identified $125,000 in contracts with C3T.

110.    O.M. did not identify in the business plan or the contract list that O.M. had provided to SBA that Pagasa had any relationship with Nuvo or Sonag I, another Brian Ganos-owned company. However, Pagasa's financial records show that Pagasa received $126,075 from Nuvo between December 12, 2012, and March 21, 2014. Pagasa also received $100,866.50 from Sonag I between May 8, 2013, and June 2, 2015.

111.    Although Pagasa was allegedly being paid for completing work on these contracts, CS-1 reported that Pagasa was not doing any actual work. Instead, the work was performed by C3T, Nuvo, and Sonag employees, and Pagasa was identified as a subcontractor only to establish a work history for work that had ostensibly been performed by Pagasa.

112.    Financial records for Pagasa and C3T show that Pagasa's Tri City bank account was opened on September 17, 2012, with a $5,000 check from C3T. However, in O.M.'s October 2015 business plan submitted to SBA, O.M. reported that O.M. personally had provided the funding for the initial capitalization of the company.

113.    On September 1, 2015, Pagasa obtained its 8(a) certification.

38

114.    O.M. provided SBA a business plan for Pagasa that was signed on October 5, 2015, and approved on November 25, 2015. In this plan, O.M. listed O.M.'s home and business address as 2XXX S. 58th Street, West Allis, WI. O.M. also identified business relationships and former projects with Milwaukee Piping and Plumbing, Inc., LJ Properties of Wisconsin, Sonag Load and Go, and Sonag Ready Mix. O.M. did not identify any business relationships with Nuvo, Sonag, or her former employer, C3T.

115.    On October 22, 2015, an SBA employee having the initials "S.M." conducted Pagasa's 8(a) program orientation, which took place at Pagasa's newly acquired office space located at 5500 W. Florist Ave., Milwaukee, Wisconsin – the same building that houses Sonag, Nuvo, and C3T. O.M. informed S.M. that Pagasa had recently moved into the new office space and explained that O.M. was able to move into the retail space without having to sign a formal lease. S.M. recalled that the next-door tenant was C3T, and that there was an open entrance (not a doorway) in the back of Pagasa's office, on the south wall, that appeared to lead to C3T's office space.

116.    During the orientation, O.M. explained to S.M. that O.M. was the 100% owner of Pagasa and that Pagasa employed approximately four full-time employees, including herself. O.M. was instructed to revise her business plan and to provide SBA with a signed lease agreement.

117.    After the orientation, O.M. emailed her lease to the SBA. A review of the Pagasa's lease agreement showed that it was for 60 months, starting on October 1, 2015, and ending on September 30, 2020. According to the lease agreement, the owner of the building was Sonag I, a Ganos-owned company.

39

118. In August 2016, as a result of this investigation, a search warrant was executed at the 5500 W. Florist Avenue building. Subsequently, O.M. voluntarily withdrew Pagasa from the 8(a) program.

**Contract Accountant, L.M.**

119. CS-1 reported that L.M. performed all the corporate accounting functions for Sonag, Nuvo, and C3T, and that L.M. had work space within the building located at 5500 W. Florist Ave., Milwaukee, Wisconsin. However, L.M. was a private contractor and not an employee of any of the Ganos-owned companies.

120. A former Nuvo employee advised that he did not know the accountant for Nuvo very well, but recalled that the accountant worked for Sonag and C3T in addition to Nuvo.

121. Surveillance of the office building revealed that L.M. worked on site at the building located at 5500 W. Florist Avenue, Milwaukee Wisconsin, which houses Sonag, Nuvo, C3T, and Pagasa. During the surveillance period, L.M. was seen entering the building at approximately 8:00 a.m. daily, and leaving at approximately 4:30 p.m. Monday through Friday.

122. In October 2012, federal agents interviewed L.M. regarding L.M.'s involvement with C3T and Sonag. L.M. reported that from April 2002 to October 2010, L.M. was employed by Sonag to monitor and report all Sonag's financial data. While L.M. was employed with Sonag, L.M. met J.H., whom L.M. described as Sonag's Vice President. In approximately 2006, L.M. assisted J.H. and T.A. in establishing C3T by filling out and filing the required documents and online database entries. After 2010, L.M. left Sonag and became a self-employed accountant. L.M. stated that C3T is one of L.M.'s biggest clients and requires most of her time. L.M. explained that she provides all necessary accounting services, including the preparation of

40

all financial records and reports. L.M. explained that she reports C3T's financial status to T.A. on a daily or weekly basis.

123. A review of C3T's corporate records revealed that, in 2006, L.M. was listed as the alternate point of contact for C3T in the CCR database.

124. CS-1 stated that L.M. has control over the entire general ledger function and the financial accounts for all of the referenced companies, which enables L.M. to transfer profits from job-to-job and company-to-company[5] within the job-cost software – facts that underscore the affiliation among Sonag, Nuvo, C3T, and Pagasa.

125. CS-1 reported that L.M. frequently placed expenses with projects for which they were not incurred. During a consensually recorded conversation with L.M., CS-1 confronted L.M. about the practice of transferring unrelated expenses to Nuvo projects. CS-1 told L.M. that CS-1 understood why L.M. did it, to improve the appearance of profitability to the banks and bonding companies, to which L.M. replied "Uh-Huh."

126. A review of public records indicates that L.M. owns LJM Accounting Services, Inc. ("LJMAS"). According to DFI records, as of January 2016, the business address for LJMAS was L.M.'s residence located at W147 N5XXX Dolphin Drive, Menomonee Falls, Wisconsin. A review of Transamerica Retirement Solutions records revealed that correspondence for Sonag's, Nuvo's, C3T's, and Pagasa's 401(k) accounts are being sent to L.M.'s LJMAS home business address. L.M. was listed as the primary contact for these 401(k) accounts. A review of L.M.'s bank records showed that L.M. had no income other than that from Sonag, Nuvo, C3T, and Pagasa.

---

[5] In the accounting profession, this activity is commonly referred to as "profit shifting" or "profit smoothing." But such profit shifting is not a legitimate practice between non-affiliated companies.

41

**Nuvo's Bank Accounts**

127.  BMO Harris Bank records show that Nuvo Construction Company, Inc. maintained a checking account with Community Bank Group, account number ending in 3889 prior to December 31, 2007, until September 7, 2008, when BMO Harris Bank purchased Community Bank Group and converted Nuvo's Community Bank Group 3889 account to BMO Harris checking account number ending in 1990 ("Nuvo 1990"). Nuvo maintained this checking account until February 21, 2014, as one of its primary business accounts.

128.  BMO Harris Bank records indicate that Nuvo also maintained checking account ending in 5207 ("Nuvo 5207"), which was opened on August 14, 2009. Nuvo maintained this checking account until November 30, 2012.

**C3T's Bank Accounts**

129.  Bank records show that C3T maintained a checking account ending in 5866 ("C3T 5866") as its primary business account at BMO Harris Bank. C3T 5866 was opened on January 13, 2005. J.H. and T.A. are listed as signers on the account as of December 5, 2011. The name and address displayed on the monthly statements during the review period is C3T Inc., 6045 North 55th Street, Milwaukee WI 53218.

130.  BMO Harris Bank records show that C3T maintained a money market bank account ending in 5215 ("C3T 5215") during 2010 and 2011. This account did not function as an operating account.

**Funds To Be Seized**

131.  Based on the facts set forth in this affidavit, I submit that there exists probable cause to believe that the following amounts in the following accounts are subject to forfeiture

42

and seizure as proceeds of the set-aside fraud scheme and conspiracy and as money involved in a concealment money laundering conspiracy:

- Up to $1,349,496 from UBS account number ending in 0703, held in the name of "Sonag Company Inc. pleg'd coll acct-FBO UBS Bank USA"; and

- Up to $885,071 from UBS account number ending in 0589, held in the name of "Sonag Inc."

132. The attached Flow of Funds Chart depicts the relevant transactions.

## Fraudulent Beginning and Perpetuation of Nuvo and C3T

133. Nuvo and C3T owed their beginnings to this fraud scheme. As detailed above, Ganos worked with J.L. and others to create Nuvo, to place J.L. as the straw owner of Nuvo, and to obtain 8(a) approval for Nuvo – all so that Nuvo could fraudulently obtain 8(a) contracts that Ganos and Sonag Co. were no longer eligible to receive.

134. Likewise, Ganos worked with T.A., J.H., and L.M. to create C3T, to place T.A. as the straw owner of C3T, and to register C3T as a SDVOSB entity specifically – all so that C3T could fraudulently obtain SDVOSB contracts that Ganos, Sonag Co., and Nuvo could not receive.

135. After founding Nuvo and C3T, Ganos and his co-conspirators perpetuated the fraud scheme by making false representations about Nuvo's and C3T's eligibility for the 8(a) and SDVOSB programs, by obtaining set-aside government contracts, and by laundering the profits from those contracts to the benefit of Ganos and others.

136. But for the profits that Nuvo and C3T made through this fraud scheme, neither Nuvo nor C3T would likely have continued to exist following their founding.

43

137. Specifically, according to Nuvo's general ledger, between January 2004 and December 2015, Ganos received, through Nuvo, approximately $124.6 million in gross revenues.[6] A review of the Federal Procurement Database in April 2016 showed that Nuvo received a total of $71 million in 8(a) set-aside contracts during that period, meaning that at least 57% of Nuvo's gross revenues are known, at present, to be traceable to this fraud scheme. According to witness S.F., who worked for Nuvo as a project manager from 2003 through 2011, even though Nuvo did do some construction projects that were not 8(a) set-aside contracts, the vast majority of Nuvo's profits came from 8(a) set-aside contracts. Specifically, S.F. estimated that, during the eight years he worked for Nuvo, only 40% of Nuvo's contracts were set-aside contracts, but S.F estimated that 90% of Nuvo's profits came from those 8(a) contracts – because those 8(a) contracts were so lucrative.

138. Likewise, C3T's general ledger reflects that, between January 2006 and April 2016, Ganos received, through C3T, approximately $204.7 million in gross revenues. A review of the Federal Procurement Database in April 2016 showed that C3T received a total of $197 million in SDVOSB set-aside contracts during that period. Thus, at least 96% of C3T's gross revenues are known, at present, to be traceable to this fraud scheme.

**Transfer of $3 Million in Nuvo and C3T Proceeds and Likely Profits to Sonag Company**

139. In January 2011, Ganos caused the transfer of $3,000,000 of proceeds that Nuvo and C3T had earned through the fraud scheme – which sum likely consisted largely or wholly of net profits that Nuvo and C3T had made on those contracts – to Sonag Company.

---

[6] As noted above, Nuvo's general ledger also reflects an additional $52 million in revenue that is excluded from the total above because it was passed through entirely to Sonag Ready Mix LLC, another Ganos-controlled company.

44

140. Specifically, on January 12, 2011, Ganos signed a signature card, which identified himself and Sonag Company Inc. as the account owners of the Morgan Stanley Sonag account ending in 7004.

141. Two days later, on January 14, 2011, Ganos caused three transfers to be made to the Morgan Stanley Sonag 7004 account, each for $1,000,000, for a total of $3 million. The first transfer came from Nuvo 5207. The second transfer came from C3T 5215. The third transfer came from C3T 5866.

142. Financial records show that the $3 million in Nuvo and C3T funds that Ganos transferred to the Morgan Stanley Sonag 7004 account were criminal proceeds, and profits, traceable to the set-aside contract scheme that Ganos perpetrated through C3T and Nuvo.

143. That each of the three $1 million transferred funds were criminal proceeds and profits of the scheme is shown by two sets of facts. First, that those funds were profits, and not merely gross revenues, follows from the fact that none of the $3 million in transferred funds were needed to pay Nuvo's or C3T's expenses, such as wages, construction materials, or overhead costs. Rather, Ganos was able to move the funds out of Nuvo's and C3T's operating accounts into investment accounts that he controlled. Second, those profits were almost certainly derived entirely or almost entirely from profits earned on set-aside contracts. That is a reasonable inference as to C3T because C3T made 96% of its revenues on set-aside contracts. It also a reasonable inference as to Nuvo because, at least according to one of its former, longtime project managers, Nuvo made 90% of its profits on 8(a) set-aside contracts.

**The $1 Million Transferred from Nuvo 5207 to the Morgan Stanley Sonag 7004 Account is Traceable to Profits From Set-Aside Contracts**

144. The $1 million transferred from the Nuvo 5207 account to the Morgan Stanley Sonag 7004 account was funded by two earlier transfers from the Nuvo 1990 account, totaling $1.1 million, into the Nuvo 5207 account.

145. Those two earlier transfers, in turn, were funded by 8(a) fraud proceeds, which were laundered through Nuvo's money market account 5207 for the purpose of concealment. According to S.F., who worked as a Nuvo project manager from 2003-2011, Brian Ganos made it clear that profits were not to be left on Nuvo's books. If Nuvo projects made money, Brian Ganos depleted those Nuvo profits – either by spending those profits on non-Nuvo expenses or by transferring those profits to bank accounts controlled by Brian Ganos. For example, Brian Ganos used profits from Nuvo projects to pay Ganos's personal expenses and to pay for renovations on the building that Brian Ganos owns on Florist Avenue in Milwaukee. Likewise, Ganos purchased heavy equipment using money made on Nuvo projects but then described that equipment as Sonag assets on Sonag Company books. S.F. was told to keep J. L. "in the dark" about how much money Nuvo was making, because Brian Ganos did not feel that J. L. was "entitled" to the Nuvo profits.

146. As previously described in paragraph 54, on the SBA Form 1450, Individual Compensation Worksheet, that Ganos caused Nuvo to submit, Nuvo falsely stated that from 2008 through 2011, Brian Ganos received no compensation from Nuvo. Brian Ganos also submitted SBA form 1010, Individual Information, on which he stated, falsely, that in 2011 and 2012, he did not have authorization to make withdrawals from, or have access to, Nuvo's bank account.

147. First, $600,000 was transferred from Nuvo 1990 to Nuvo 5207 on March 8, 2010. Those funds came from payments on an 8(a) set-aside U.S. Army contract. Specifically, from March 2, 2010 to March 8, 2010, Nuvo received a total of $615,537.61 in 8(a) payments that were electronically deposited by the government into Nuvo 1990, as follows:

    A.    **W911SA09C0018**, an 8(a) contract: A contract payment of $49,963.71 was made into Nuvo 1990 on March 2, 2010.

    B.    **W912J208D0001**, an 8(a) contract: A contract payment of $55,328.14 was made into Nuvo 1990 on March 4, 2010.

    C.    **W911SA07D0008**, an 8(a) contract: Three contract payments totaling $510,245.76 were made into Nuvo 1990 on March 8, 2010.

148. The balance in Nuvo 1990 on March 1, 2010, before receiving the first contract payment identified above was $1,812,897.47. The lowest intermediate balance in Nuvo 1990 between March 1, 2010, and March 8, 2010, when the $600,000 was transferred to Nuvo 5207 was $1,568,455.47. Therefore, the fraudulently obtained contract 8(a) payments identified above were not dissipated and remained in Nuvo 1990 before the $600,000 in proceeds was transferred from Nuvo 1990 to Nuvo 5207 on March 8, 2010.

149. After that $600,000 in proceeds was transferred to Nuvo 5207 on March 8, 2010, that $600,000 remained in Nuvo 5207 before being transferred as part of the $1,000,000 transfer to the Morgan Stanley Sonag account on January 14, 2011. The lowest intermediate balance in Nuvo 5207 before additional proceeds were deposited was $681,352. Therefore, all $600,000 traceable to the fraudulently obtained contract payments identified above remained in Nuvo 5207 before the $1 million in funds were transferred from Nuvo 5207 to the Morgan Stanley Sonag 7004 account on January 14, 2011.

150. Between February 26, 2010 and March 8, 2010, other monies totaling $306,091.49 from clean and unknown sources that have not, to date, been connected to the 8(a)

fraud scheme were also deposited into Nuvo 5207. However, I have been advised by forfeiture counsel for the United States Attorney's Office, Scott Campbell, that one of the accepted tracing methods that can be used to trace criminal proceeds that have been – like the proceeds in this case – deposited into bank account, where they were then commingled with presumably "clean funds," before funds were transferred from that bank account, is the "drugs in, first out" or "proceeds out first" rule. Under that "proceeds out first" tracing rule, the portion of the transferred funds – from an account containing commingled funds – consisting of traceable criminal proceeds may be "consider[ed] to be any one withdrawal, or any asset purchased with such withdrawal, to the extent of the" amount of criminal proceeds then on deposit in the account. *See United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159 (2d Cir. 1986); *see also United States v. $448,342.85*, 969 F.2d 474, 477 (7th Cir. 1992) (citing *Banco Cafetero Panama* favorably).

151. Second, an additional $500,000 in criminal proceeds was transferred from Nuvo 1990 to Nuvo 5207 on October 19, 2010. Those funds came from payments on an 8(a) set-aside U.S. Army contract. Specifically, from August 9, 2010 to October 18, 2010 a total of $578,377.02 in 8(a) payments were electronically deposited by the government into Nuvo 1990, as follows:

   A. **W912J208D0001**, an 8(a) contract: A contract payment totaling $137,107.80 was made into Nuvo 1990 on August 09, 2010.

   B. **W912J208D0001**, an 8(a) contract: A contract payment totaling $86,823.24 was made into Nuvo 1990 on August 13, 2010.

   C. **W912J208D0001**, an 8(a) contract: A contract payment totaling $25,982.86 was made into Nuvo 1990 on August 23, 2010.

48

D. **W912J208D0001**, an 8(a) contract: A contract payment totaling $43,188.00 was made into Nuvo 1990 on September 15, 2010.

E. **W912J208D0001**, an 8(a) contract: A contract payment totaling $67,823.93 was made into Nuvo 1990 on September 30, 2010.

F. **W912J208D0001**, an 8(a) contract: A contract payment totaling $90,937.39 was made into Nuvo 1990 on October 18, 2010.

G. **W912J208D0001**, an 8(a) contract: A contract payment totaling $126,513.80 was made into Nuvo 1990 on October 18, 2010.

152. The balance in Nuvo 1990 on August 9, 2010, before receiving the first contract payment identified above was $1,454,092.86. The lowest intermediate balance in Nuvo 1990 between August 9, 2010, and October 19, 2010, when the $500,000 was transferred from Nuvo 1990 to Nuvo 5207 was $1,121,774.83. Therefore, all $578,377.02 of the proceeds of the fraudulently obtained contracts identified above were not dissipated and remained in Nuvo 1990 before $500,000 of those proceeds were transferred from Nuvo 1990 to Nuvo 5207 on October 19, 2010.

153. After the $500,000 was transferred to Nuvo 5207 on October 19, 2010, that sum remained in Nuvo 5207 before being transferred, as part of the $1,000,000 transfer to the Morgan Stanley Sonag 7004 account on January 14, 2011. The lowest intermediate balance in Nuvo 5207 between October 19, 2010, and January 14, 2011, was $1,182,328. Therefore, all $500,00 in funds traceable to the fraudulently obtained contract payments identified in paragraphs 151 and 152 above – along with the $600,000 in addition proceeds in Nuvo 5207 traceable to the fraudulently obtained contract payments identified in paragraphs 147 and 148 above – were not dissipated and remained in Nuvo 5207 before $1 million traceable to those $1.1 million in

49

combined fraud proceeds were transferred from Nuvo 5207 to Morgan Stanley Sonag 7004 on January 14, 2011.

154. Between August 5, 2010 and October 19, 2010, other monies totaling $5,374,924.32 were also deposited into Nuvo 1990. Although a portion of those monies appear likely to be traceable to the fraud scheme, it has not been determined to date precisely which deposits came from the fraud scheme and which deposits came from other sources. However, as noted above, under the "proceeds out first" tracing rule, the portion of the transferred funds – from an account containing commingled funds – consisting of traceable criminal proceeds may be considered to be any one withdrawal to the extent of the amount of criminal proceeds then on deposit in the account.

155. I submit that, by the above transactions, Ganos transferred criminal proceeds – consisting largely or wholly of profits – that he had made through Nuvo as a part of the 8(a) fraud scheme, from the Nuvo 1990 account, through the Nuvo 5207 account, and then to the Morgan Stanley Sonag 7004 account for the purpose of getting those proceeds from Nuvo accounts to accounts that Ganos controlled in a surreptitious manner. Specifically, I submit that Ganos engaged in layered financial transactions to transfer set-aside fraud proceeds obtained via Nuvo to Sonag Co. bank accounts in a manner intended to conceal, among other things: (a) the nature of those proceeds, namely, that they were obtained via 8(a) fraud; (b) the source of those proceeds, namely, that they came from 8(a) contract money paid to Nuvo; (c) the location of those proceeds, in that Ganos' movement of the funds from Nuvo accounts, through Sonag accounts, and then often to accounts further downstream that Ganos controlled helped to conceal the ultimate location of the money that Nuvo earned via 8(a) contracts; and (d) the true ownership of those criminally derived proceeds, namely, that those proceeds really belonged to

50

Ganos as the orchestrator and prime beneficiary of the set-aside and money laundering conspiracies, and not to Sonag or others.

## $1 Million Transferred from C3T 5215 to the Morgan Stanley Sonag 7004 Account Is Traceable to Profits From Set-Aside Contracts

156. The second $1 million transfer to the Morgan Stanley Sonag 7004 account on January 14, 2011, came from the C3T 5215 account.

157. This $1,000,000 in funds had previously been transferred to the C3T 5215 account from the C3T 5866 account on October 19, 2010 for the purpose of concealment. Although C3T's purported owner, T.A., was largely absent from the C3T in 2010, if he were to make inquiries, he was most likely to ask about C3T's daily operating account, which was C3T 5866. By transferring $1,000,000 out of C3T 5866 into C3T 5215, Ganos moved profits out of C3T's 5866 operating account and into its 5215 account because the latter was an account less likely to be noticed by T.A. and others.

158. The balance in C3T 5215 on October 19, 2010, before receiving the $1,000,000 transfer from C3T 5866, was $117,837.60. Between October 19, 2010, and January 14, 2011, there were no withdrawals from C3T 5215, and the only other deposits were interest payments. Therefore, the $1,000,000 in funds transferred from C3T 5866 to C3T 5215 were not dissipated and remained in C3T 5215 before the $1,000,000 was transferred to the Morgan Stanley Sonag 7004 account on January 14, 2011.

159. The $1,000,000 transferred on October 19, 2010 from C3T 5866 consisted of funds traceable to payments on SDVOSB set-aside contracts. Specifically, from October 18, 2010 to October 19, 2010, C3T received a total of $1,144,587.88 in SDVOSB payments that were electronically deposited by the government into C3T 5866, as follows:

A. **VA69DC0483**, an SDVOSB contract: Contract payments totaling $235,780.55 was made into C3T 5866 on October 18, 2010.

B. **VA69DC1097**, an SDVOSB contract: A contract payment totaling $8,801.00 was made into C3T 5866 on October 18, 2010.

C. **VA69DC0683**, an SDVOSB contract: A contract payment totaling $636,168.03 was made into C3T 5866 on October 18, 2010.

D. **VA69DRA1423**, an SDVOSB contract: A contract payment totaling $263,838.30 was made into C3T 5866 on October 19, 2010.

160. The balance in C3T 5866 on October 18, 2010, before receiving the first contract payment identified above was $3,978,443.97. The lowest intermediate balance in C3T 5866 between October 18, 2010, and October 19, 2010, when the $1,000,000 was transferred to C3T 5215, was $1,107,469.48. Therefore, the fraudulently obtained contract payments identified above were not dissipated and remained in C3T 5866 before $1 million in funds traceable to those fraud proceeds were transferred to C3T 5215 on October 19, 2010.

161. Between October 18, 2010, and October 19, 2010, no monies from sources other than the 8(a) fraud scheme were deposited into C3T 5866. However, even if there were such deposits, as noted above, under the "proceeds out first" tracing rule, the portion of the transferred funds – from an account containing commingled funds – consisting of traceable criminal proceeds may be considered to be any one withdrawal to the extent of the amount of criminal proceeds then on deposit in the account.

162. As noted above, on January 14, 2011, Ganos further transferred the $1,000,000 from C3T 5215 to the Morgan Stanley Sonag 7004 account.

163. I submit that, by the above transactions, Ganos transferred criminal proceeds – consisting largely or wholly of profits – that he had through C3T via SDVOSB fraud from the C3T 5866 operating account, through the C3T 5215 account, and then to the Morgan Stanley

52

Sonag 7004 account for the purpose of getting those SDVOSB fraud profits from C3T accounts to accounts that Ganos controlled in a surreptitious manner. Specifically, I submit that Ganos engaged in these layered financial transactions to transfer SDVOSB set-aside fraud proceeds obtained via C3T to Sonag Co. bank accounts in a manner intended to conceal, among other things: (a) the nature of those proceeds, namely, that they were obtained via SDVOSB fraud; (b) the source of those proceeds, namely, that they came from SDVOSB contract payments made to C3T; (c) the location of those proceeds, in that Ganos' movement of the SDVOSB proceeds from C3T accounts and to Sonag accounts that Ganos controlled helped to conceal the ultimate location of the proceeds that C3T had fraudulently obtained via SDVOSB contracts; and (d) the true ownership of those criminally derived proceeds, namely, that those proceeds and profits really belonged to Ganos as the orchestrator and prime beneficiary of the set-aside and money laundering conspiracies, and not to Sonag or others.

## $1 Million Transferred from C3T 5866 to the Morgan Stanley Sonag 7004 Account Is Traceable to Profits From Set-Aside Contracts

164.    The third $1 million transfer to the Morgan Stanley Sonag 7004 account on January 14, 2011, came from C3T 5866.

165.    This $1,000,000 was traceable to fraudulently obtained payments on SDVOSB set-aside contracts. Specifically, from January 7, 2011 to January 14, 2011, C3T received a total of $1,108,668.60 in SDVOSB payments that were electronically deposited by the government into C3T 5866, as follows:

> A. **VA69DC0684**, an SDVOSB contract: A contract payment totaling $67,104.00 was made into C3T 5866 on January 7, 2011.
>
> B. **VA69DRA1331**, an SDVOSB contract: A contract payment totaling $38,040.89 was made into C3T 5866 on January 7, 2011.

53

C. **VA69DRA1424**, an SDVOSB contract: A contract payment totaling $42,979.72 was made into C3T 5866 on January 7, 2011.

D. **VA69DC0483**, an SDVOSB contract: A contract payment totaling $69,564.02 was made into C3T 5866 on January 10, 2011.

E. **VA69DC0483**, an SDVOSB contract: A contract payment totaling $8,145.51 was made into C3T 5866 on January 11, 2011.

F. **VA69DC1111**, an SDVOSB contract: A contract payment totaling $99,519.37 was made into C3T 5866 on January 12, 2011.

G. **VA69DC1215**, an SDVOSB contract: A contract payment totaling $64,452.00 was made into C3T 5866 on January 12, 2011.

H. **VA69DC1320**, an SDVOSB contract: A contract payment totaling $354,741.71 was made into C3T 5866 on January 12, 2011.

I. **VA69DC0608**, an SDVOSB contract: A contract payment totaling $4,567.00 was made into C3T 5866 on January 13, 2011.

J. **VA69DC1143**, an SDVOSB contract: A contract payment totaling $1,037.00 was made into C3T 5866 on January 13, 2011.

K. **VA69DC1501**, an SDVOSB contract: A contract payment totaling $36,371.00 was made into C3T 5866 on January 13, 2011.

L. **VA69DRA1339**, an SDVOSB contract: A contract payment totaling $112,281.45 was made into C3T 5866 on January 13, 2011.

M. **VA69DRA1434**, an SDVOSB contract: A contract payment totaling $97,949.39 was made into C3T 5866 on January 13, 2011.

N. **VA69DC0483**, an SDVOSB contract: A contract payment totaling $60,575.84 was made into C3T 5866 on January 14, 2011.

O. **VA69DC1585**, an SDVOSB contract: A contract payment totaling $48,339.70 was made into C3T 5866 on January 14, 2011.

P. **VA69DC1586**, an SDVOSB contract: A contract payment totaling $3,000.00 was made into C3T 5866 on January 14, 2011.

166.  The balance in C3T 5866 on January 7, 2011, before receiving the first contract payment identified above, was $2,210,653.01. The lowest intermediate balance in C3T 5866 between January 7, 2011, and January 14, 2011, when the $1,000,000 was transferred to the Morgan Stanley Sonag 7004 account, was $2,250,782.01. Therefore, the fraudulently obtained contract payments identified above were not dissipated and remained in C3T 5866 before $1 million in funds traceable to those fraud proceeds were transferred to the Morgan Stanley Sonag 7004 account on January 14, 2011.

167.  Between January 3, 2011, and January 14, 2011, other monies totaling approximately $17,972.80 from clean or unknown sources that have not been connected to the 8(a) fraud scheme to date were also deposited into C3T 5866. However, as noted above, under the "proceeds out first" tracing rule, the portion of the transferred funds – from an account containing commingled funds – consisting of traceable criminal proceeds may be considered to be any one withdrawal to the extent of the amount of criminal proceeds then on deposit in the account.

168.  I submit that, by the above transactions, Ganos transferred criminal proceeds – consisting largely or wholly of profits – that he had through C3T via SDVOSB fraud from the C3T 5866 operating account to the Morgan Stanley Sonag 7004 account for the purpose of

55

getting those SDVOSB fraud proceeds from C3T accounts to accounts that Ganos controlled in a surreptitious manner. Specifically, I submit that Ganos engaged in these layered financial transactions to transfer SDVOSB set-aside fraud proceeds obtained via C3T to Sonag Co. bank accounts in a manner intended to conceal, among other things: (a) the nature of those proceeds, namely, that they were obtained via SDVOSB fraud; (b) the source of those proceeds, namely, that they came from SDVOSB contract payments made to C3T; (c) the location of those proceeds, in that Ganos' movement of the SDVOSB proceeds from C3T accounts and to Sonag accounts that Ganos controlled helped to conceal the ultimate location of the proceeds that C3T had fraudulently obtained via SDVOSB contracts; and (d) the true ownership of those criminally derived proceeds, namely, that those proceeds and profits really belonged to Ganos as the orchestrator and prime beneficiary of the set-aside and money laundering conspiracies, and not to Sonag or others.

## Portions of the $3 Million in Nuvo and C3T Profits That Were Transferred to the Morgan Stanley Sonag 7004 Account Now Reside in Two UBS Accounts Sought To Be Seized

169. The $3 million in fraud proceeds that Ganos caused to be transferred from Nuvo and C3T accounts into the Morgan Stanley Sonag 7004 account in January 2011 were transferred between several other Morgan Stanley accounts, and then to UBS accounts where they reside today as fraud proceeds.

170. Specifically, in May 2012, Ganos transferred the $3,000,000, at a reduced value, to another Morgan Stanley account held in the name of Sonag Company, ending in 5004 ("Morgan Stanley Sonag 5004 account"). Then in July 2012, Ganos transferred $1,800,000 from that account to a Morgan Stanley account in the name of C3T, ending in 9000. In November 2012, Ganos moved those funds, at a reduced value of $1,792,959.93, back to the Morgan Stanley Sonag 5004 account. Those transactions appear to have been made for concealment

56

purposes in that Ganos placed $1,800,000 into an account in the name of C3T during a period when C3T was seeking to be reinstated by the CVE and regulators were more likely to probe C3T's finances. Ganos thus likely moved the funds into a C3T-named account to conceal that he was the true owner of the funds. Once the period of intensified scrutiny passed, Ganos moved the funds back to the Morgan Stanley Sonag 5004 account, and out of C3T's name.

171. In approximately May 2013, Ganos moved the full balance of funds of $2,937,857 from the Morgan Stanley Sonag 5004 account to a new investment account at UBS. This new UBS investment account, ending in 0589 ("UBS 0589"), was opened that same date, in the name of Sonag Inc., and the opening documents were signed by Brian Ganos, who is the authorized signer for the account.

172. The balance in the Morgan Stanley accounts never dropped below $2,722,149.47 from January 2011 through May 2013, and there were no other significant deposits or withdrawals to the Morgan Stanley accounts. The increase in funds from that lowest intermediate balance to the transfer amount of $2,937,857 was due to market changes and increases in the value of underlying holdings. Therefore, the full account balance of $2,937,857 that was transferred from the Morgan Stanley Sonag account to UBS 0589 remained proceeds of the set-aside fraud scheme.

173. On or about January 11, 2015, UBS account ending in 0703 ("UBS0703") was opened in the name of "Sonag Company Inc. pleg'd coll acct-FBO UBS Bank USA," and the opening documents were signed by Brian Ganos.

174. On or about January 23, 2015, a UBS Line of Credit ending in 5483 ("UBS LOC") was opened in the name of Sonag Company Inc., and the opening documents were signed by Brian Ganos.

57

175. In January and February of 2015, the balance in UBS 0589 totaling $3,008,969.99 was transferred to the UBS 0703 account. The increase in value came from market changes and not any deposits of new funds.

176. The balance in UBS 0589 never dipped below $2,814,433.72 and there were no significant deposits or withdrawals from May 2013 through January 2015 when Ganos began transferring the account balance to UBS 0703. Therefore, the full account balance of $3,008,969.99 that was transferred to UBS 0703 remained proceeds of the fraud scheme.

177. In May 2016, $860,000.00 was moved back from the UBS 0703 account into the UBS 0589 account. The balance in UBS 0589 has remained and still constitutes proceeds from the fraud scheme.

178. Since May 2016, all those set-aside fraud proceeds have remained in UBS 0703 except for $800,000 that was transferred to pay down the UBS LOC on August 22, 2016. Notably, that transfer was made less than three weeks after a search warrant was executed at Ganos' business premises on August 3, 2016.

179. According to UBS, as of October 24, 2017, the account balance in UBS 0703 is $1,349,496, and the account balance in UBS 0589 is $885,071. As noted above, all of these funds are traceable to proceeds of the above-described set-aside fraud scheme and conspiracy.

180. A portion of the funds in UBS 0703 and UBS 0589 consist of interest earned on the proceeds. I have been advised by forfeiture counsel for the U.S. Attorney's Office that such interest is subject to forfeiture and seizure because interest earned on property subject to forfeiture – like any other type of appreciation in the value of property subject to forfeiture – is considered to be traceable to proceeds. *See, e.g.*, *United States v. Wahlen*, 459 F. Supp. 2d 800, 814 (E.D. Wis. 2006) (if property that is acquired with commingled funds appreciates in value,

58

Case 2:17-mj-00959-NJ   Filed 11/08/17   Page 59 of 63   Document 1

the fraction of the property subject to forfeiture is assumed to have appreciated at the same rate; thus, the Government is entitled to forfeit the same fraction of the appreciated value as it could have forfeited if there was no appreciation). Here, because all of the principal funds in the accounts sought to be seized consisted of criminal proceeds, all the interest earned on those principal proceeds funds is likewise subject to forfeiture.

## The Three $1 Million Transfers of Nuvo and C3T Proceeds to the Morgan Stanley Sonag Account Were Made as Part of a Money Laundering Conspiracy

181. The three transfers of $1 million in set-aside fraud scheme proceeds, from Nuvo and C3T accounts to the Morgan Stanley Sonag 7004 account, constituted concealment money laundering transactions that were made as part of an overall money laundering conspiracy having Ganos at its hub. Ganos and his co-conspirators continued that money laundering conspiracy until at least July 2015, when Ganos worked with L.M. to move funds from C3T to Trinity Marketing Services, as detailed above. In fact, that money laundering conspiracy likely continued until August 2016, when the first search warrant was executed at Nuvo's and C3T's offices.

182. Under the SBA 8(a) program rules and the SDVOSB program rules, the qualified owners – here, supposedly J.L. and T.A. – were required to actually control Nuvo and C3T. But, as detailed above, Ganos and his co-conspirators exercised true control over Nuvo and C3T from their fraudulent beginnings through at least August 2016. Consequently, Nuvo and C3T were *never* eligible to obtain the set-aside contracts or the profits they earned on those set-aside contracts.

183. Ganos entered into a money laundering conspiracy with L.M. and others with the object of using the Nuvo's and C3T's fraudulently obtained proceeds and profits for the benefit

59

of Ganos, his companies, and his co-conspirators. The conspiracy's purpose was to engage in financial transactions designed to conceal the nature, source, ownership, and location of the fraud proceeds.

184.     The manner and means of the conspiracy included the arranging of financial transactions to move fraud proceeds from Nuvo and C3T to companies that Ganos controlled, including Sonag Company, Sonag I, and Trinity Marketing, LLC. Many of these transfers were not justified by any legitimate work or services furnished. Many of the transfers instead were designed to conceal that those funds consisted of fraud proceeds; that those proceeds stemmed from amounts, consisting largely or wholly of profits, that Nuvo and C3T earned on set-aside contracts; how Ganos and conspirators in fact controlled those fraud proceeds; and where those criminal proceeds ultimately ended up. If, in contrast, Ganos had received payment of those proceeds directly from Nuvo or C3T, the fraudulent nature of the proceeds would have been more apparent to government regulators and, in addition, those criminal proceeds would have been much easier to find and trace.

185.     The manner and means of the conspiracy also included the arranging of financial transactions to use Nuvo's and C3T's funds, derived from the set-aside scheme, to pay for personal expenses of Ganos and co-conspirators, such as remodeling work on their homes or the payment of personal credit cards. By directing the payment of Nuvo and C3T's funds to third-party vendors – and sometimes also through intermediate accounts – rather than transferring Nuvo or C3T funds to Ganos or his co-conspirators directly, those indirect distributions of criminal proceeds from Nuvo and C3T accounts to Ganos helped conceal the nature, source, ownership, and location of the proceeds.

186.  The three transfers of $1 million of Nuvo and C3T profits in January 2011 to the Morgan Stanley Sonag 7004 account were financial transactions conducted as a part of this money laundering conspiracy. By moving funds traceable to proceeds of the set-aside fraud scheme to an account in Sonag's name, Ganos concealed that the true nature, source, ownership, and location of the funds, which were actually proceeds and profits obtained through Nuvo and C3T set-aside contracts. Through those concealment money laundering transactions, Ganos was able to move the criminal proceeds and access them for his own purposes without the funds appearing to have any connection to Nuvo or C3T, let alone the fraudulently obtained set-aside contracts that generated those profits.

187.  For these reasons, I submit that there exists probable cause to believe that the $3 million in funds that Ganos and others caused to be transferred from Nuvo and C3T accounts to the Sonag Co. Morgan Stanley 7004 account in January 2011 are part of a concealment money laundering conspiracy. I further submit that all funds traceable to those $3 million in transfers are subject to forfeiture and seizure as having been involved in concealment laundering transactions and a concealment money laundering conspiracy.

## Conclusion

188.  Based on my training and experience, and the evidence I have received, and the information I have obtained in the course of this investigation to date, I submit there exists probable cause to believe that up to $1,349,496 in UBS 0703 and up to $885,071 in UBS 0589:

- Constitute, or are traceable to, proceeds and profits of the above-described set-aside fraud scheme, committed in violation of the wire fraud and wire fraud conspiracy statutes, 18 U.S.C. §§ 1343 and 1349;

- Were involved in concealment money laundering transactions and a money laundering conspiracy, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h), and are therefore subject to forfeiture and seizure as having been "involved in" those money laundering offenses;

- Are therefore subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) (as "involved in" money laundering) and (C) (as proceeds), including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and to criminal forfeiture under 18 U.S.C. §§ 981(a)(1)(C) (as proceeds) and 982(a)(1) (as "involved in" money laundering) and 28 U.S.C. § 2461; and

- Because all those funds are subject to forfeiture, they are also subject to seizure under both the civil seizure statute, 18 U.S.C. § 981(b), as well as the criminal seizure statutes, 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

# # #